NUMBER 13-04-028-CR

 

                         COURT OF APPEALS

 

               THIRTEENTH DISTRICT OF TEXAS

 

                  CORPUS CHRISTI - EDINBURG

 

 

 

MEGAN MAE ADAMS                                               Appellant,

 

                                           v.

 

THE
STATE OF TEXAS                                               Appellee.

 

 

 

                  On appeal from the 275th
District Court

                           of Hidalgo County,
Texas.

 

 

 

                              O P I N I O N

 

          Before Chief Justice Valdez and
Justices Castillo and Garza

Opinion
by Justice Castillo

 








After the juvenile court waived and then transferred
jurisdiction to the district court, appellant Megan Mae Adams, and
co-defendants Frank Macias and Christopher Lozano were indicted for murder.[1]  The trial court granted the State's motion
for joinder of three co-defendants for trial. 
A jury convicted each of the three of murder and assessed punishment at
a term of life imprisonment in the Texas Department of Criminal JusticeBInstitutional Division for Macias and Adams, and a
term of fifteen years for Lozano.  By six
issues, Adams appeals the judgment.[2]  We affirm.

I.  BACKGROUND

A.  The
Strangulation of Jan Barnum[3]








On or about March 5, 2003, at approximately 5:00
p.m., Adams and co-defendants Macias and Lozano, juveniles, were detained by
juvenile investigator Miguel Hernandez for criminal trespass at a vacant house
near Adams' residence.  After being
released, the three put into motion plans to run away to Louisiana where Adams
had relatives.  They initially intended
to travel by bus, but then decided to use Jan Barnum's car.  Barnum was Adams' maternal grandmother.[4]  Their plan was to wait for Barnum to fall
asleep before taking the car.  When it
took too long for Barnum to fall asleep, a plan developed to kill her.   As Macias waited in the bathroom, Adams led
Barnum through the hall of the apartment they shared.  Adams was present while Macias used a ribbon
to strangle Barnum.  At some point,
Lozano entered the apartment and observed Macias strangling Barnum.  Neither Adams nor Lozano took any action nor
attempted to prevent or stop Macias from strangling Barnum.  With Adams driving, the three fled in
Barnum's car and drove first to a truck stop, then to the residence of
J.R.,  Macia's girlfriend, and then to a
convenience store.








Bernardo Aguilar, an employee of the convenience
store, was working  the night shift.  He reported to police officer John Vargas,
who was at the scene,[5]
that three juveniles at the store looked nervous and suspicious.  Aguilar indicated the juveniles had come into
the store for gas and an atlas.  Officer
Vargas recognized the juveniles from earlier in the day and suspected they were
again runaways.  He called dispatch to
report three possible runaways and requested that another officer be sent to
the location.  Officer Javier Gallegos
was dispatched to the location and confirmed that all three juveniles had been
reported as runaways.  Officer Gallegos
placed the juveniles in the patrol car to take them to their residences.  Macias was released to his stepfather.  Lozano was released to his aunt.  Adams attempted to stay with Lozano; however,
Lozano's aunt refused because Adams had not been staying with Lozano as Adams
stated to Officer Gallegos.

Adams asked to be taken to the home of her
"uncle," Andrew Narvaez, who informed officer Gallegos that Adams was
staying with her grandmother and that he knew where her apartment was located.[6]  Officer Gallegos followed Narvaez to Adams'
grandmother's apartment.  En route, Adams
repeatedly insisted that she needed to speak with Narvaez privately, which
Officer Gallegos permitted when they arrived at the apartments where Barnum
lived.  Adams whispered to Narvaez that
an intruder had broken into the apartment and strangled Barnum.  Narvaez then told this to Officer Gallegos
who then requested an ambulance, a supervisor and backup.  He obtained a key to the residence from a
security guard on duty because the windows and doors were locked.  Once inside the apartment, office Gallegos
found Barnum's body facedown in a bedroom. 
It appeared that she had been strangled. 
When juvenile investigator Santiago Solis arrived at the scene, he
found, among other things, four to five strands of brown hair about two inches
long, grasped in Barnum's right hand.[7]








Officer Michael Mata was also dispatched and arrived
at Barnum's apartment where he found Adams inside Officer Gallegos' patrol
car.  Mata read Adams her Miranda[8]
warnings.  Adams volunteered that an
intruder strangled her grandmother. 
Officer Mata transported Adams to the police department.  Adams was taken before  the juvenile magistrate and then returned to
the police station where she gave a statement to police.  Macias and Lozano also appeared before the
magistrate and gave statements regarding the events of that evening, up to and
including Barnum's death.  The three
statements were admitted in evidence. 

In his statement, Macias admitted he murdered Barnum
but explained that he did so at Adams' request. 
Macias stated that Adams gave him the ribbon he used to kill
Barnum.   In her statement, Adams
admitted she was present during the attack but stated that the decision to kill
Barnum was solely Macias' decision. 
Lozano admitted in his statement that he walked in during the attack and
although he told Macias to stop, he did nothing to attempt to stop Macias.  He admitted that, prior to the attack, as the
two waited for Adams outside the apartment, 
Macias told him that Adams wanted Macias to kill Barnum.  Lozano did not believe Macias had the courage
to kill Barnum and did nothing.








At trial, Macias testified in his defense.  He admitted he killed Barnum.  He testified that, while Lozano and he waited
for Adams outside Barnum's apartment, Adams gave him a ribbon with an attached
medal, to use in the assault.  Macias
removed the medal, threw it on the lawn, entered the apartment, and waited in
the bathroom.  Adams walked through the
hall and Barnum followed her as the two argued. 
Macias sprung from the bathroom and, using both hands and the ribbon,
strangled Barnum until "her hands stopped moving."  He testified that, at one point, he
momentarily stopped, but Adams threatened to call the police and accuse Macias
of attempting to kill Adams if Macias did not finish what he started.          

B.  Prior
Confrontations Between Adams and Barnum

In addition to the evidence concerning the
strangulation of Barnum, the record contains evidence of prior confrontations
and ill will between Adams and Barnum. 
The testimony of J.R., Macias' girlfriend and Adams' friend, relates an
earlier plan of Adams and J.R. to murder Barnum by putting cockroach poison and
Nyquil in Barnum's drinking water.  J.R.
testified that, on February 28, 2003, she was present when Adams and Barnum
argued and Adams said that she "hated [Barnum] and she wanted her to
die."  J.R. asked "Why not kill
her?" and Adams agreed.  Macias and
Lozano were present in the apartment at the time.[9]  Adams put the poison in Barnum's Sprite but
did not give it to Barnum.  At 3:00 a.m.
the following morning, Narvaez drove the four of them to a store where Adams
stole Nyquil pills.  At the apartment,
Adams made holes in the pills with a needle and put the medicine in a glass of
water that Adams told Barnum to drink. 
A.G., another friend of Adams corroborated the testimony of J.R.








The resident who lived in the apartment above
Barnum's testified that he heard arguments every day between Adams and
Barnum.  On the night of the murder, he
heard the two arguing again.  The
apartment complex manager testified she was aware of Barnum's problems with
Adams.  

II. 
JURISDICTION








Adams' first two issues challenge the trial court's
jurisdiction.  She asserts:  (1) the State did not comply with summons
requirements as mandated by section 53.06 of the family code, see Tex. Fam. Code Ann. ' 53.06 (Vernon 2002);[10]  and (2) the juvenile court did not provide
the statutory admonition in section 54.03(b) of the family code, see Tex. Fam. Code Ann. ' 54.03(b) (Vernon
2002),[11]
thereby invalidating the transfer of jurisdiction to the criminal district
court.[12]


A.  Issuance
and Service of Summons

By her first issue, Adams essentially asserts that
because of a defect in the issuance and service of summons on her,  a juvenile, the juvenile court never acquired
jurisdiction to transfer and, thus, the district court never acquired
jurisdiction to try her for the transferred offense. Further, she adds, the criminal
district court did not have jurisdiction because the juvenile court did not
effect issuance or service of summons of the petition for transfer.[13]  








The juvenile proceedings in this case were governed
by family code section 54.02, which states, among other things, that (1) the
petition and notice requirements of sections 53.04, 53.05, 53.06, and 53.07 of
the family code must be satisfied, and (2) the summons must state that the
purpose of the hearing is to consider discretionary transfer to criminal
court.  Tex.
Fam. Code Ann. _54.02(b) (Vernon Supp. 2004-05). 
Failure of the summons to comply with section 54.02(b) deprives the
juvenile court of jurisdiction to consider discretionary transfer.  See Grayless v. State, 567 S.W.2d 216,
219 (Tex. Crim. App. 1978) (citing Johnson v. State, 551 S.W.2d 379
(Tex. Crim. App.1977); In re D.W.M., 562 S.W.2d 851 (Tex.
1978)).  Absent a valid waiver of
jurisdiction by the juvenile court, it does not have jurisdiction over the
accused.  Tex. Pen. Code Ann. _8.07 (Vernon Supp. 2004-05); See Grayless,
567 S.W.2d at 220.  Thus, an order of the
juvenile court waiving jurisdiction when it does not have jurisdiction is a
nullity and deprives the district court of jurisdiction to try the accused for
a criminal offense.  Id. at 220; Tex. Pen. Code Ann. _8.07 (Vernon Supp. 2004-05).  

Section 53.06 states in clear and unambiguous terms
that summons shall be issued to the child, among other persons.  Tex.
Fam. Code Ann. _53.06 (Vernon 2002).  In the
absence of a summons on the juvenile, the juvenile court does not acquire
jurisdiction to consider discretionary transfer.  In re D.W.M., 562 S.W.2d 851, 853
(Tex. 1978).  This court has held that
the service requirements of the family code are satisfied where a summons and
petition are served on the juvenile.  In
re K.P.S., 840 S.W.2d 706, 709 (Tex. App.CCorpus
Christi 1992, no pet.). 








The appellate record contains (1) an Order to Issue
Summons for Child for Discretionary Transfer to Criminal Court, (2) the
summons, (3) the petition for discretionary transfer to criminal court, (4) the
return of summons, and (5)  the precept
to serve.[14]
 

The petition and summons were filed on May 22, 2003,
in the 92nd district juvenile court, and included a request for a hearing for
the purpose of considering waiver of jurisdiction under section 54.02(a) of the
family code.[15]  Tex.
Fam. Code Ann. ' 54.02(a) (Vernon Supp. 2004-05).  Proof of service of the summons, effected on
Adams on May 20, 2003, complies with the unequivocal mandate of section 53.06
of the family code regarding issuance and service of the summons.  There is no indication in the record of any
earlier pleading in the juvenile or district court.   Because the record establishes proof of
service of the summons and petition, we conclude that the service requirements
of section 53.06(a) of the family code were satisfied.  Id at '53.06(a)
(Vernon Supp. 2004-05); K.P.S., 840 S.W.2d at 209.  The juvenile court had jurisdiction to enter
the transfer order.  Accordingly, the
district court had jurisdiction.  We
overrule Adams' first issue. 

B.  Statutory
Admonishment in Juvenile Court 








By her second issue, Adams asserts that the trial
court lacked jurisdiction to prosecute because the juvenile court lacked
jurisdiction, having failed to provide the statutory admonishment required
under section 54.03 of the family code prior to transfer.  See Tex.
Fam. Code Ann. _54.03(b) (Vernon Supp. 2004-05).[16]  The State responds that Adams did not
preserve error[17] and, even so, the complained-of
admonishment applies only to an adjudication hearing and not to a transfer
proceeding.[18]  

An adjudication hearing incorporates many of the
features of a criminal trial, including the right to a jury trial, the right to
remain silent, and the right to exclude evidence inadmissible under the rules
governing criminal proceedings.[19]  Id. A proceeding to declare a juvenile
a delinquent, including an adjudication hearing under section  54.03 of the family code and a proceeding to
waive jurisdiction and to certify a juvenile as an adult for criminal
prosecution under section 54.02, are separate and distinct proceedings. See
Grayless, 567 S.W.2d at 219; Tex.
Fam. Code Ann. '_ 54.02, 54.03.  Statutory
admonishment is required in an adjudication of a juvenile; it is not required
in a transfer or other preliminary proceeding.  Tex. Fam. Code Ann. ' 54.03(b).  








The parties acknowledge and the record reflects that
Adams' case did not involve an adjudication hearing in juvenile court.  The requirement for statutory admonition
never arose, and Adams did not object to the failure to admonish.  Rather, the juvenile court transferred
jurisdiction to district court so that Adams could be tried as an adult.  See Id _54.02 (Vernon 2002). 
The transfer petition was the first and only juvenile proceeding.    

Adams also asserts that her due process and due
course of law rights were violated by the juvenile court's failure to
admonish.  However, Adams did not present
her complaint below.  








To preserve a complaint for appellate review, a
party must present a timely request, objection, or motion to the trial court
stating the specific grounds for the desired ruling if the specific grounds
were not apparent from the context.  Tex. R. App. P. 33.1(a); Blue v.
State, 41 S.W.3d 129, 131 (Tex. Crim. App. 2000) (en banc); see Keeter
v. State, No. PD-1012-03, 2005 Tex. Crim. App. LEXIS 521, at *9 n.11 (Tex.
Crim. App. April 6, 2005) (citing Lankston v. State, 827 S.W.2d 907, 909
(Tex. Crim. App. 1992) (en banc) ("All the party must do to avoid the
forfeiture of a complaint on appeal is to let the trial court know what he
wants, why he thinks himself entitled to it, and to do so clearly enough for
the trial court to understand him at a time when the trial court is in a proper
position to do something about it.")); Haley v. State, No. 1531‑03,
2005 Tex. Crim. App. LEXIS 1621, at *11 (Tex. Crim. App. October 5, 2005).[20]  An accused may waive even constitutional
rights.  Saldano v. State, 70
S.W.3d 873, 887 (Tex. Crim. App. 2002) (en banc); Jenkins v. State, 912
S.W.2d 793, 815 (Tex. Crim. App. 1995) (op. on reh'g) (en banc). "Some
rights are widely considered so fundamental to the proper functioning of our
adjudicatory process as to enjoy special protection in the system."  Blue, 41 S.W.3d at 131("A principle
[sic] characteristic of these rights is that they cannot be forfeited. That is
to say, they are not extinguished by inaction alone.").  Instead, an accused must expressly relinquish
a fundamental right.  Id.  

We have already concluded that the juvenile and
district courts had jurisdiction in the respective proceedings before
them.  Because the requirement for
statutory admonishment never arose, Adams' jurisdictional challenge fails.   We further conclude that the failure of a
juvenile court to properly admonish a juvenile pursuant to section 54.03(b) of
the family code must be presented to the juvenile court in order to preserve
the complaint for appeal.  In re E. F.,
986 S.W.2d 806, 810 (Tex. App.BAustin  1999,
pet. denied).  Such failure must be
specifically assigned and is not fundamental error that can be raised for the
first time on appeal.  Id.  Adams did not preserve error for appellate
review.  Haley, 2005 Tex. Crim.
App. LEXIS 1621, at *11. We overrule Adams' second issue.








III. 
SEVERANCE ON SEPARATE, CO-DEFENDANT INDICTMENTS

Adams challenges the trial court's denial of her
motion to sever trials on two grounds. 
By her third issue, Adams maintains that the trial court abused its
discretion  by refusing to grant the
motion to sever her trial from that of her co-defendants.  Adams asserts a joint trial was clearly
prejudicial because of (1) antagonistic defenses, and (2) varying degrees of
guilt.  By her fourth issue, Adams states
that she was denied peremptory strikes to which she would otherwise have been
entitled had she been tried alone.  The
State responds that Adams has not shown "clear prejudice," mutually
exclusive defenses, or harm.  

A.  Scope and
Standard of Review








Texas Code of Criminal Procedure article 36.09
mandates that the court order a severance upon a timely motion and upon
introduction of evidence which establishes either (1) that there is a previous
admissible conviction against one defendant, or (2) that a joint trial would be
prejudicial to any defendant.  Tex. Code Crim. Proc. Ann. art. 36.09
(Vernon 1981);[21]
Aguilar v. State, 26 S.W.3d 901, 903 (Tex. Crim. App. 2000) (en
banc);  Aguilar v. State, 39
S.W.3d 700, 702 (Tex. App.BCorpus Christi 2001, pet. ref=d); Davila v. State, 4 S.W.3d 844, 846-47
(Tex. App.BEastland 1999, no pet.); Silva v. State, 933
S.W.2d 715, 718-19 (Tex. App.BSan Antonio 1996, no pet.).  

We review the denial of a motion to sever trials for
an abuse of discretion.  Mendoza v.
State, 61 S.W.3d 498, 501-02 (Tex. App.BSan
Antonio 2001), aff'd on other grounds, 88 S.W.3d 236 (Tex. Crim. App.
2002).  An abuse of discretion exists
when the trial court's ruling is outside the zone of reasonable disagreement
regarding the law applicable to an issue. 
See Montgomery v. State, 810 S.W.2d 372, 391 (Tex. Crim.
App. 1991) (op. on reh'g) (en banc). 








The trial court has considerable discretion in
deciding whether a joint trial would be so prejudicial to a particular
defendant as to warrant a severance unless a joint trial would prejudice a
co-defendant as a matter of law. See Aguilar, 39 S.W.3d at 702; Simon
v. State, 743 S.W.2d 318, 322 (Tex. App.BHouston
[1st Dist.] 1987, pet. ref=d); see Garza v. State, 622 S.W.2d 85,
91 (Tex. Crim. App. 1981); Aguilar, 39 S.W.3d at 702.  When an accused is not entitled to a
severance as a matter of right, the denial of same by the trial court
constitutes an abuse of discretion "only when the movant satisfies the
'heavy burden' of showing clear prejudice."  Patterson v. State, 783 S.W.2d 268,
270 (Tex. App.BHouston [14th Dist.] 1989, pet. ref'd); see also
Silva, 933 S.W.2d at 718.  A showing
of clear prejudice based on an allegation that the co‑defendants'
defenses are inconsistent is apparently established if the co‑defendants'
respective positions are mutually exclusive to the extent that "the jury
in order to believe the core of one defense must necessarily disbelieve the
core of the other."  Aguilar,
39 S.W.3d at 702 (citing Goode v. State, 740 S.W.2d 453, 455 n.2 (Tex.
Crim. App. 1987) (citations omitted). 

A motion to sever on the grounds of unfair prejudice
under article 36.09 is "timely" if made at the first opportunity or
as soon as the grounds for prejudice become or should have become apparent,
thus providing the trial court an opportunity to rule on the potentially
prejudicial evidence at the time it is introduced.  Aguilar, 26 S.W.3d at 901.  The mere allegation that prejudice will
result is not evidence of, or a sufficient showing of, prejudice under article
36.09, particularly when the severance is discretionary with the trial
judge.  Patterson, 783 S.W.2d at
270.  If the motion to sever is not
supported by evidence, its denial is not an abuse of discretion.  See Salazar v. State, 127
S.W.3d 355, 356 (Tex. App.BHouston [14th Dist.] 2004, pet. ref'd), Silva,
933 S.W.2d at 718-19. 

B.  The Record








The State filed a motion for joinder of defendants
for trial, asserting that the murder charges against the three defendants
involved the same victim and arose out of the same criminal activity.  The State further asserted that there were no
admissible convictions that would be introduced in evidence or any other
evidence that would make a joint trial of all three defendants prejudicial to
any one defendant.  Adams filed a motion
to sever, stating that a joint trial would deprive her of a separate and fair
trial on grounds of inconsistent defenses and varying degrees of guilt between
the three defendants.  Further, Adams
asserted that a joint trial would deprive her of effective assistance of
counsel, due process of law, and due course of law under the federal and state
constitutions.  

At the pretrial hearing, Adams requested that the
trial court review the reporter's record of the transfer hearing as evidence in
support of her motion.  Lozano's counsel
argued, in part, that the testimony of Adams or Macias at trial could be
exculpatory as to Lozano, and, accordingly, a decision on whether to grant
separate trials would be premature.[22]  Macias did not oppose the State's motion for
joinder.  The trial court postponed a
ruling on the competing motions until it had the opportunity to review the
record of the transfer proceeding.  On
August 15, 2003, the trial court signed an order granting the State's motion
for joinder.  The order recites a finding
that "having the defendants tried by the same jury will not substantially
prejudice their rights."   On August
19, 2003, during a pretrial hearing, Adams reurged the motion to sever on
grounds that she would be denied (1) peremptory strikes and (2) the opportunity
to confront witnesses as guaranteed by the federal and state constitutions if
the extrajudicial confessions of the other non‑testifying defendants were
admitted in evidence.  Lozano joined in
Adams' argument.  Macias did not oppose a
joint trial.  The trial court denied the
motion for severance. 

C.  Analysis








Adams does not assert that the same evidence would
not have been admitted in a separate trial.[23]  Rather, Adams limits her argument to clear
prejudice based on antagonistic defenses of three defendants tried together
(issue three) and denial of peremptory strikes (issue four).  

1. Antagonistic Defenses

By her third issue, Adams argues that the respective
defenses were mutually exclusive to the extent that, to believe the core of one
defense, the jury must necessarily disbelieve the core of the other.  The State counters that the jury could have
believed the core of all three statements. 








At trial, without objection, the extrajudicial
statements of Adams, Macias, and Lozano were admitted in evidence.[24]  The three statements reflect that Adams,
Lozano, and Macias were present at some point when Macias strangled
Barnum.  The crux of Adams' statement and
defense was that Macias acted alone and she was neither a principal nor a
party.  Lozano's statement and defense
was that he was neither a principal nor a party.  Macias' statement and defense was that Adams
and Lozano were parties to the offense because the plan was Adams' and Lozano
encouraged him.  Even assuming Adams did
not direct Macias to kill Barnum, Adams did nothing to stop Macias' entry into
the apartment;[25]
rather, she argued with Barnum while aware Macias was inside the
apartment.  Further, Adams did nothing to
stop the attack while present in the apartment and in the hall where the attack
occurred.  She remained in the apartment
and fled only after Barnum appeared to be lifeless.  Then, in the police unit while en route from
the convenience store to her apartment, Adams concealed the murder from law enforcement
and, with the murder about to be discovered, told the officers of an intruder
who attacked Barnum and whom she tried to stop. None of the extrajudicial
statements show that Macias or Lozano requested Adams to conceal the identity
of the assailant, Macias.  

In his extrajudicial statement, Lozano admitted he
knew of talk of murder but he did not believe Macias would do it.  He observed the attack and did not act to
stop it.  At Adams' direction, he
retrieved the victim's purse.  He fled
the scene in the victim's car, with the person he observed strangle
Barnum.  Lozano concealed the murder
weapon.  Macias admitted committing the
murder both in his extrajudicial 
statement and at trial.  His
defense, presumably in mitigation of punishment, centered on Adams' ordering
him to kill Barnum and providing the murder weapon.  








Lozano's extrajudicial statement corroborated
Macias' statement that the murder plan was Adams'.  Lozano's and Adams' statements corroborate
that Lozano entered the apartment and told Macias to stop strangling
Barnum.  At trial, Macias admitted he
lied in his extrajudicial statement twice: 
(1) when he stated that Lozano told him to "go for it" in
response to Macias' disclosing Adams' request that Macias kill Barnum and (2)
when Macias stated that Lozano smiled when he saw Macias strangling
Barnum.  While Macias inculpated Lozano
by his statement to police, at trial he provided exculpatory, or otherwise
mitigating evidence, that Lozano told him to stop. However, Macias gave Lozano
the murder weapon, implicating Lozano. 

The evidence does not support Adams' claim of
mutually inconsistent defenses.[26]  Aguilar, 39 S.W.3d at 703.  Adams must show that the co-defendants'
respective positions were mutually exclusive to the extent that "the jury,
in order to believe the core of one defense must necessarily disbelieve the
core of the other."  Id. at
702.  The core of Adams' defense was that
Macias acted on his own accord and Adams did not provide the murder
weapon.  However, she facilitated Macias'
access into the apartment.  The core of
Lozano's defense was that he was essentially an unwilling bystander, both as
recipient of Macias' information of Adams' plan and as observer of the
murder.  However, after the murder, he
retrieved the victim's purse,  fled with
the victim's assailant and Adams, and concealed the murder weapon.  The core of Macias' defense was, presumably,
in pre-conviction mitigation of punishment. Macias never denied he murdered
Barnum.  Adams and Lozano did nothing to
physically stop Macias from committing the offense before or as it occurred,
and willingly fled with him from the crime scene in the victim's car, with the
victim's purse and money.  








On this record, we cannot conclude that the trial
court abused its discretion in denying the motion to sever.  Inculpatory statements in Adams'
extrajudicial statement, the crux of the evidence offered in support of the
motion to sever, place her voluntarily at the crime scene during the murder and
behind the wheel of the escape vehicle with the victim's assailant and
money.  The same statement to police
establishes that Adams voluntarily concealed the identity of the assailant and
the crime at the outset, while Macias and Lozano disclosed Macias as the
assailant.  We conclude that Adams'
participation as a party was apparent from the record before the trial court
and, thus, the trial court, in denying the motion to sever, could have
reasonably concluded that the defenses were not mutually exclusive. 

Further, the trial record does not show that Adams
raised objections on grounds of prejudice, that became or should have become
apparent, at the time prejudicial evidence, if any, was introduced.  Thus, Adams has not shown she would have
proceeded differently if the trial court had severed her case.  See Davila, 4 S.W.3d at
847.  We further conclude that Adams has
not shown clear prejudice.   We overrule
Adams' third issue.

2.  Denial of
Peremptory Strikes

By her fourth issue, Adams maintains she was
reversibly denied peremptory strikes because of the joinder of defendants for
trial.  The State responds that the
argument is without merit.  We review
jury selection and peremptory strike questions for an abuse of discretion by
the trial court.  Lopez v. Foremost
Paving, Inc. 709 S.W.2d 643, 644 (Tex. 1986).








A peremptory challenge is made to a juror without
assigning any reason therefor.  Tex. Code Crim. Proc.Ann. art. 35.14
(Vernon Supp. 2004-04).  Ordinarily, in
non-capital felony cases the State and the defendant are entitled to ten
peremptory challenges.  See Tex. Code Crim. Proc. Ann. art. 35.15(b) (Vernon Supp.
2004-05).  If two or more defendants are
tried together, each defendant shall be entitled to six peremptory challenges
and the State to six for each defendant. 
Id.  

Before voir dire, Adams objected that a joint trial
would allow the State eighteen peremptory strikes "while we are in fact
only going to be getting six.  That puts
them at an advantage."  At the
conclusion of voir dire, the trial court instructed counsel to exercise six
strikes and "one beyond" for the alternate juror.  

In construing a statute, we look to the plain
meaning of its language unless the language is ambiguous or the plain meaning
leads to absurd results that the Legislature could not possibly have
intended.  Tex. Gov't Code Ann. ' 311.011(a) (Vernon 2004); Boykin v. State,
818 S.W.2d 782, 785 (Tex. Crim. App. 1991); Lane v. State, 933 S.W.2d
504, 515 n.12 (Tex. Crim. App. 1996). 
Viewed under normal rules of statutory construction, the trial court's
order is consistent with the mandatory language in article 35.15(b) of the code
of criminal procedure.  Accordingly, we
cannot conclude that the trial court acted without reference to guiding rules
or principles.  Montgomery, 810
S.W. 2d at 391.  We conclude the trial
court did not abuse its discretion.  We
overrule Adams' fourth issue.  

IV.  MOTION TO
SUPPRESS JUVENILE'S ORAL STATEMENTS













By her sixth issue, Adams maintains the trial court
reversibly erred by denying her motion to suppress on two bases.  First, Adams asserts that the trial court
should have suppressed any statement she made or any evidence gathered at the
time of her illegal detention because Officer Gallegos did not comply with
section 52.02(a) of the family code. Tex.
Fam. Code Ann. _ 52.02(a) (Vernon Supp. 2004-05). 
Section 52.02(a) of the family code governs the procedures for
"taking a child into custody."[27]   Adams maintains that, based on section
52.02, any decision as to whether further detention of the child was warranted
should have been made by an authorized officer of the juvenile court and not
law enforcement.[28]  She argues that, because Officer Gallegos
usurped a function vested only in an officer designated by the juvenile court,
her statements were illegally obtained and thus inadmissible under article
38.23 of the code of criminal procedure. 
See Tex. Code Crim. Proc.
Ann. art. 38.23. (Vernon Supp.
2004-05). 

Second, Adams asserts that, because Narvaez was an
agent of Officer Gallegos, her statements to Narvaez, who subsequently repeated
them to Gallegos, were illegally obtained and inadmissible.  Without particulars, Adams further asserts
that any "other evidence" was illegally obtained and should also have
been suppressed.  The State responds that
(1) Adams preserved error only with respect to her oral statements to Narvaez
and, even so, (2) Adams' statutory rights were not violated. 

A. 
Preservation of Error








We must initially address whether Adams preserved
error.  Kombudo v. State,
No.1832-04, 2005 Tex. Crim. App. LEXIS 1345, at *3‑4 (Tex. Crim. App.
September 14, 2005) (en banc) (holding that a reviewing court must address an
appellee's reply as to preservation of error and an alternative argument in an
appellee's reply) (per curiam) (citations omitted).  In short, Adams essentially argues that her
oral statements (1) made at the time of her initial detention or custody at the
convenience store to Officer Gallegos and (2) to her "uncle Andy"
Narvaez "as an agent of Officer Gallegos" at the apartment complex
should have been suppressed because Gallegos did not comply with section
52.02(a) of the family code.  She sought
suppression of all statements and evidence Officer Gallegos obtained because he
was usurping the duties of a duly authorized juvenile officer.  

The trial court convened a pretrial evidentiary
hearing on Adams' and Macias' separate motions to suppress.  In her motion, Adams requested the trial
court suppress evidence of any and all statements (whether oral, recorded, or
written) taken from her by any law enforcement official or anyone acting on
their behalf at any time following her initial arrest by any officer.  She further requested the trial court
suppress any and all evidence obtained in an "unlawful manner."  However, at the suppression hearing, Adams
testified that she was waiving her challenge as to suppression of her written
statement.  Later in the hearing, Adams'
defense counsel argued as follows:

Your Honor, I just wanted to clarify one more
thing.  There was an oral statement that
was made allegedly by Ms. Adams to an individual who we are alleging at the
time was acting as an agent of the State. 
That statement, oral statement, we are going to be urging our Motion to
Suppress.  The only waiver that we had
was to the written statement.

 

And also I would join with [Macias'] motion and with
respect to the suppression of the arrest our Motion to Suppress Evidence covers
that evidence that [the prosecutor] had talked about, that which was taken from
Ms. Adams without a search warrant.  And
also the arrest which would fall under Chapter 14 of the Texas Code of Criminal
Procedure.

 








Other than her oral statement to Narvaez, Adams
neither directs us to the record nor addresses in her brief what evidence she
sought to suppress.  The record
demonstrates that Macias' defense counsel argued suppression of evidence on
grounds that section 52.02 of the family code was violated and there was no
probable cause for the arrest.  We
conclude that Adams preserved error as to suppression of her oral statement to
Narvaez.  

We agree with the State's position that Adams has
not preserved error as to physical evidence admitted at trial.  Kombudo, 2005 Tex. Crim. App. LEXIS
1345, at*3‑4; Haley v. State, No.-1531‑03, 2005 Tex. Crim.
App. LEXIS 1621, at*11 (Tex. Crim. App. October 5, 2005)("preservation of
error is a systemic requirement that must be reviewed by the courts of appeals
regardless of whether the issue is raised by the parties") (citations
omitted).  However, as the following
record excerpt demonstrates, Adams did not object when the complained-of
evidence was adduced through similar testimony from another police officer who
was at the crime scene.[29]

Officer Gallegos testified as to Adams' request to
speak with Narvaez upon arrival at the apartment.  On the prosecutor's direct examination,
Gallegos testified before the jury as follows:

Q: At that point when you get to the apartment does
[Adams] say anything to you in the patrol car between Mr. Narvaez['s] house and
the apartments?

 

A.  That she
wants to talk to [Narvaez], she has something to tell him and I said why don't
you tell me and she said, I want to talk to [Narvaez].

 

Q.  What
happens when youBwhere do you pull into the apartments?








A.  We pull
into the east side of the apartment complex, where the apartment is right next
to the parking lot of Palm Street.

 

Q.  And where
does Andy Narvaez pull up to?

 

A.  He pulls
inBas soon as he pulls into the apartment complex he
parks in the first parking space and I park right behind him.

 

Q.  What
happens next?

 

A. [Adams] said I want to talk to [Narvaez].  I want to tell him something.  I said, okay, fine.  I called [Narvaez] over and then I said, [Narvaez],
will you come over here, [Adams] wants to tell you something real bad.  And he says, okay.  And so I just stood there right by the
driver's side door and, well, I said, whisper in his ear.  And he opened the door for her and she
reaches out.  And then he had this
worried look like he was going to go to the apartment.  And I stopped him, and I said, You need to
tell me what she said.  And heBand he said that [Adams] told him that someone broke
into the apartment and strangled her grandmother. . . .

 

Q.  Where did
[Adams] remain?

 

A.  I had her
get back in the patrol car and wait for another officer to standby and while
she's in the car, I didn't want to leave her by herself. . . .  She kept on repeating someone broke in and
strangled her grandmother.

 








Similarly, Officer Michael Mata testified that, when
he arrived at the apartment complex, he observed Adams inside a police unit
shouting and screaming.  He did not
question her.  Adams told him that her
grandmother was by herself and Adams feared that "she might have been
killed or something."  In response,
he read her Miranda warnings but denied asking her questions.  Adams told him that somebody had gone into
the apartment and began to strangle her grandmother, adding that she "just
tried getting him off and she couldn't do anything about it."  Adams "blurted out that her grandmother
was dead," and she "had no one else."  Mata further testified that Adams said she wanted
the subject who killed her grandmother in front of her so that she could kill
him, stating she would "stuff paper down his throat and kill him with her
bare hands."  

At trial, Narvaez testified he knew Barnum because
they attended the same church.  When
Officer Gallegos asked to leave Adams with Narvaez, Narvaez responded that he
needed to contact Barnum first because Barnum had previously requested Narvaez
contact her regarding Adams.  Regarding
the events that occurred at the crime scene, Narvaez testified that Officer
Gallegos told him Adams could not get out of the police unit because she was
under arrest.  Narvaez could not,
however, recall what Adams told him at the scene because of the effects of
medication he had previously taken that night.

A proper objection is one that is specific and
timely.  Geuder v. State, 115
S.W.3d 11, 13 (Tex. Crim. App. 2003); Martinez v. State, 98 S.W.3d 189,
193 (Tex. Crim. App. 2003).  Further,
with two exceptions, the law in Texas requires a party to continue to object
each time inadmissible evidence is offered. 
Martinez 98 S.W.3d at 193. 
Two exceptions exist where counsel either (1) obtains a running
objection, or (2) requests a hearing outside the presence of the jury.  Id. 
Therefore, while Adams preserved error as to the statements to Narvaez,
she did not preserve error as to all similar evidence of statements she made to
Officer Mata at the scene.  Id.








Even assuming error was preserved, we consider the
State's alternate theory in response to Adams' sixth issue presented.  Kombudo, 2005 Tex. Crim. App. LEXIS
1345, at *3-4.  The State maintains that
the trial court properly denied the motion to suppress on grounds that she has
not shown improper police conduct.  

B. Motion to Suppress Standard of Review

We uphold a trial court's ruling on a suppression
motion if it is reasonably supported by the record and is correct on any theory
of law applicable to the case.  Villarreal
v. State, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996) (en banc); Perales
v. State, 117 S.W.3d 434, 438 (Tex. App.BCorpus
Christi 2003, pet. ref'd).  This is true
even if the decision is correct for reasons different from those espoused by
the trial court.  Romero v. State,  800 S.W.2d 539, 543 (Tex. Crim. App.
1990).  For the following reasons, we
conclude that, even if Adams preserved error as to her argument on appeal, the
trial court did not abuse its discretion in denying the motion to suppress on
grounds that her statutory rights were not violated, as the State asserts in
its reply.

C.  The Record








The parties do not dispute that  Adams was detained, together with Macias and
Lozano, at the convenience store on suspicion that they were runaways because
they had a runaway incident earlier in the day and because of their statements
to the convenience store employee. 
Off-duty police investigator John Vargas testified that he was at the
drive-through at a convenience store at about 11:00 to 11:15 on the night in
question.  He recognized Adams from a
runaway incident earlier that day.  The
convenience store employee related his concerns regarding the juveniles
traveling to Louisiana to Officer Vargas. 
Vargas radioed for assistance and Officer Gallegos was dispatched to the
scene.  Vargas testified he asked the
juveniles if they were runaways.  One of
the males responded, "Yeah, again," but Vargas could not identify
which one of them answered.  According to
his report, the three said, "Yeah again."  Meanwhile, Vargas observed in plain view in
the back of the car clothes and a hamster in a cage,[30]
indicating to him that the three were running away.  Vargas testified that the vehicle was
registered to Barnum.  Vargas further
testified that Adams, Macias, and Lozano were put in Officer Gallegos' unit so
that they would not run away.  Vargas
testified that he told Gallegos, "they probably killed the grandmother."  Gallegos responded that "you never
know."  








Gallegos testified that he observed Adams sitting on
the driver's side of the vehicle.  He
observed Macias attempt to enter a pickup truck but the driver waved Macias off
and drove away.  While Gallegos spoke
with Vargas, the three juveniles were in the store looking in his
direction.  Gallegos entered the store
and asked what they were doing and for their identification.  They had none.  Initially, Adams was non-cooperative with identifying
information.  Concerned that they might
flee, he asked them to step in his unit and left the door open.  He confirmed that Macias and Lozano were
reported as runaways and there was no report as to Adams.  Aware that the juveniles' vehicle was stalled,
Gallegos asked Adams for the keys so that he could move the car from the
pumps.  Adams complied.  When he moved the car, he observed a backpack
and clothes in plain view.  He opined
that the juveniles were "going somewhere."  Gallegos testified that the three were not
handcuffed and the sole purpose for the detention was to release them to a
parent or guardian.  

Later, after securing identifying information and
making numerous telephone calls to the juveniles' respective residences without
answer, Gallegos released  Macias to his
stepfather at his home and then left Lozano with his aunt.  Adams requested and attempted to remain with
Lozano, indicating to Gallegos that she was staying with Lozano.  Lozano's aunt refused to allow Adams to
stay.  Attempting to take Adams home,
Gallegos asked her address.  Adams
responded that her grandmother was not home because she was visiting a
friend.  When Gallegos sought another
family resource, Adams requested that Gallegos take her to her "uncle
Andy" Narvaez's  house.  Gallegos complied.  En route, Adams requested to speak privately
with Narvaez, and Gallegos agreed. 
Gallegos told Narvaez that Adams said her grandmother was with a
friend.  Narvaez said he would get
dressed so they could  check.  Narvaez drove past Gallegos' unit.  Adams again said she wanted to talk to
Narvaez.








When they reached the apartment complex, Adams spoke
privately with  Narvaez.  Gallegos testified that Narvaez looked
worried.  Gallegos told Narvaez "to
speak," and Narvaez said that Adams "told him that someone broke into
the apartment and strangled her grandmother."  Gallegos opined the situation was an
emergency.  He told Adams "to get
back in the car."  Adams said aloud
that someone broke in.  Gallegos
testified that Adams "kept saying" that someone broke in and
strangled her grandmother.  At one point,
Adams began "hyperventilating" and medical attention was attempted at
the scene, which she refused, requesting that medical personnel  take care of her grandmother.  Gallegos testified that Adams said someone
broke into the apartment.  However,
Gallegos observed that the door was locked. 
A security guard for the apartment complex opened the apartment.  The apartment showed no signs of forced
entry.  Following a trail of blood in the
hallway of the apartment, Gallegos found Barnum's body behind a closed door in
one of two bedrooms.  Gallegos sought
assistance "to go recover the two juveniles" he had "dropped
off." As reasons for his police conduct, Gallegos testified that (1) he
responded to a dispatch that three juveniles were at a convenience store past
curfew, (2) they indicated they were planning to go to Louisiana, (3) they had
clothes in the car and a hamster indicating they were "going
somewhere," (4) the vehicle stalled at a convenience store and they were
without transportation after curfew, (5) the vehicle belonged to Barnum, (6)
Adams had no driver's license, (8) he observed Macias attempt to board another
vehicle although rejected by the driver, (9) the juveniles were earlier that
same day runaways and he confirmed that Macias and Lozano were again reported
as runaways, and (10) Gallegos ultimately "found a body that no one was
telling him what had happened until he got there."  After he found Barnum's body, Gallegos
determined that the three were "going to leave for a reason."  








At the conclusion of the hearing, Adams' defense
counsel further argued that Adams sought to suppress "the statements,
specifically and only the statement that was given allegedly by Ms. Adams to
Mr. Narvaez . . . and then Officer Gallegos."  Further, "[t]here were shoes that were
taken from her . . . .  We'll address
those whenever she attempts to introduce those."  Defense counsel adopted Macias' suppression
arguments and requested suppression of the evidence on grounds that law
enforcement did not comply with section 52.02 of the family code.[31]  Without stating the grounds, the trial court
denied the motion to suppress.

Adams asserts that Officer Gallegos "wholly
failed to comply" with section 52.02(a) of the family code by usurping a
function vested solely in an officer designated by the juvenile court.  She asserts that her statements, if illegally
taken, could not have been admitted against her in her criminal trial under
article 38.23 of the code of criminal procedure.  She argues that Officer Gallegos' sole reason
for noncompliance with section 52.02 of the family code was to obtain her
statements and evidence.             

D.   Police
Conduct

1.  Reasonable
Suspicion








An accused seeking to suppress evidence on the basis
of illegal police conduct bears the burden of proof to rebut a presumption of
proper police conduct.  Moreno v.
State, 124 S.W.3d 339, 344 (Tex. App.BCorpus Christi 2003, no pet.) (citing McGee v.
State, 105 S.W.3d 609, 613 (Tex. Crim. App. 2003)).  Reasonable suspicion exists if the officer
has specific articulable facts that, when combined with rational inferences
from those facts, would lead him to reasonably suspect that a particular person
has engaged or is (or soon will be) engaging in criminal activity.  Garcia, 43 S.W.3d 527, 530 (Tex. Crim.
App. 2001); Woods v. State, 956 S.W.2d 33, 35 (Tex. Crim. App.1997) (en
banc).  The articulated facts that
support a temporary detention must be taken as a whole, and the reasonable
suspicion formed must be based on the totality of the circumstances.  Woods, 956 S.W.2d at 38.  Where the initial detention is unlawful, any
evidence seized subsequent to such a detention is inadmissible.  Gurrola v. State, 877 S.W.2d 300, 302
(Tex. Crim. App.1994) (en banc).  The
ultimate standard set forth in the Fourth Amendment is reasonableness.  Cady v. Dombrowski, 413 U.S. 433,
439  (1973).

Absent a warrant, the State had the  burden at the suppression hearing to show by
a preponderance of the evidence that the officer had at least a reasonable
suspicion that Adams either had committed an offense or was about to do so
before he detained her.  See McGee,
105 S.W.3d at 613; see also Russell, 717 S.W.2d
at 9‑10.  Giving almost total
deference to the trial court in determining the historical facts, we believe
those facts to be that the officer (1) observed Adams violating curfew, without
operative transportation, and (2) had a reasonable suspicion that some activity
out of the ordinary was occurring or had occurred that was related to a
crime.  This is  because: 
(a) the juveniles were heading to Louisiana; (b) they appeared to be and
admitted they were  runaways; (c) the
three had earlier that day been detained as runaways and released; (d) Macias
and Lozano were once more reported as runaways; and (e) Adams was unlicensed to
drive and seated behind the wheel of a vehicle registered to Barnum.  We conclude that the evidence demonstrates
that the officer had reasonable suspicion to briefly detain Adams.  








2.  Probable
Cause

A child may be taken into custody if there is
probable cause to believe that she has engaged in (1) conduct that violated a
penal law of this state or a penal ordinance of any political subdivision of
this state, or (2) conduct indicating a need for supervision.  Tex.
Fam. Code Ann. ' 52.01(a)(3) (Vernon 2004).  We conclude that
the officer had probable cause to believe that Adams violated curfew and
engaged in conduct indicating a need for supervision as an admitted runaway
with an out-of-state destination, having been in runaway detention earlier the
same day, while accompanied by two reported runaways.  See Tex.
Fam. Code Ann. _ 51.03(b)(3) (Vernon Supp. 2004-05). 









The question then becomes whether these facts, when
viewed de novo, are sufficient to establish a violation of the law.  See Morrison, 71 S.W.3d
at 828;citing Terry v. Ohio, 392 U.S. 1, 21-22, 24-25 (1968); Woods
v. State, 956 S.W.2d 33, 35 (Tex. Crim. App. 1997); Roy v. State, 55
S.W.3d 153, 157 (Tex. App.CCorpus Christi 2001), pet. dism=d, improvidently granted, 90 S.W.3d 720 (Tex. Crim. App. 2002).  We conclude that the officer provided
sufficient objective facts to demonstrate that Adams was engaged in conduct
indicating a need for supervision.  We
further conclude that the officer adduced specific articulable facts to support
the right to investigate and, armed with these facts, the officer had probable
cause and was authorized to detain Adams. 
See McGee, 105
S.W.3d at 614; Stull v. State, 772 S.W.2d 449, 451 (Tex. Crim. App.
1989) (en banc) ("The test for probable cause is [w]hether at that moment
the facts and circumstances within the officer's knowledge and of which [he]
had reasonably trustworthy information were sufficient to warrant a prudent man
in believing that the [person] had committed or was committing an
offense.").  The officer's custodial
detention was, therefore, proper.[32]

3.  Ilegal
Detention

After initially detaining Adams, the officer asked
for her name, address and other pertinent information concerning her
guardian/parent in order to deliver her to a location consistent with section
52.02 of the family code.  See Tex. Fam. Code Ann. ' 52.02(a) (Vernon
2002).  Adams refused to cooperate at first but
eventually gave the address of her "uncle" Andy Narvaez.  Upon arriving at the residence of Andy
Narvaez, Adams insisted on speaking with Narvaez alone.  








Adams' statements to Narvaez were not the result of
custodial interrogation.[33]  Wilkerson v. State, No.1605-04, 2005
Tex. Crim. App. LEXIS 1619, at *10 (Tex. Crim. App. October 5, 2005) (citations
omitted) (addressing alleged state agent conduct in the context of written
statements).  Adams requested to speak to
Narvaez, not the police officer.  Narvaez
disclosed the information regarding Barnum to Officer Gallegos.  While Gallegos acted on the information
provided, evidence showed that Adams, unsolicited,  repeated the same or similar statements.  No right or privilege was violated by the
officer's asking Narvaez what Adams had told him.[34]


Adams asserts that Narvaez was an agent of Officer
Gallegos and Gallegos  illegally obtained
her oral statement to Narvaez.  However,
there are two types of "state agents": all those who are employed by
any state agency are, by definition, "state agents," but only those
who are working for or on behalf of police are law enforcement "state
agents."  Wilkerson, 2005
Tex. Crim. App. LEXIS 1619 at *10 (Tex. Crim. App. 2005) (holding that CPS
worker was not "in tandem" with police officers when interviewing the
defendant).  








The record demonstrates that Adams offered
information regarding the whereabouts of the victim when she finally did speak
with Narvaez upon arriving at the apartment complex.  There is no evidence in the record to suggest
that Narvaez was an agent of the officer as Adams suggests, or that Narvaez or
Officer Gallegos  initiated any
questioning of Adams regarding the whereabouts of her grandmother prior to her
oral statement to Narvaez.  Rather,
Adams, unsolicited, offered the information regarding Barnum first upon
arriving at Narvaez's residence and, subsequently, upon arriving at the crime
scene.  

The record does not present the scenario where the
police employ an informant to deliberately elicit incriminating statements from
a defendant in custody, solely for the purpose of helping the police gather
evidence against the defendant.  Escamilla
v. State, 143 S.W.3d 814, 824 (Tex. Crim. App. 2004) (citing State v.
Hernandez, 842 S.W.2d 306, 312‑16 (Tex. App.BSan Antonio 1992, pet. ref'd), (discussing how non‑law
enforcement personnel can become state agents for Sixth Amendment
purposes).  Officer Gallegos did not ask
Narvaez to act as a state agent nor convert an otherwise legal request of
Narvaez to disclose Adams' information into an illegal one. Id. (citing  Hernandez, 842 S.W.2d at 314, for the
proposition that creation of an agency between law enforcement and non‑law
enforcement personnel depends upon the existence of an agreement between them
at the time of the elicitation). Even if this were an offer by law
enforcement  to Narvaez  to become a state agent, there is no evidence
to support a finding that Narvaez accepted the offer. See id. 

On this record, we cannot conclude that Narvaez was
acting as a state agent when Adams spoke with him.  Id. 

 

4.  No Causal
Connection








By her motion to suppress evidence obtained in
violation of the law under article 38.23 of the code of criminal procedure,
Adams had the burden to produce evidence demonstrating the causal connection
between a violation of section 52.02(a) of the family code and the complained
of statements.  See Pham v.
State, Nos. 12‑04 & 72‑04, 2005 Tex. Crim. App. LEXIS 832,
at *17 (Tex. Crim. App. June 8, 2005)(designated for publication) (requiring a
causal connection between a violation of section 52.02(b) and the complained-of
statements).  The record does not
demonstrate nor does Adams direct us to evidence in the record that establishes
a causal connection between a section 52.02(a) violation and the complained of
statements.  Id.  The burden to produce evidence never shifted
to the State to disprove Adams' evidence or to bring an attenuation of taint
argument to demonstrate that the causal chain Adams asserted was in fact
broken.  See id. 

5. 
Unnecessary Delay

Adams asserts that Officer Gallegos unnecessarily
delayed complying within one of the statutorily enumerated actions in section
52.02 of the family code.  Section 52.02
expressly authorized Gallegos to release the juveniles to, among others, a
parent, guardian, or other responsible adult. 
Tex. Fam. Code Ann. _ 52.02(a)(1) (Vernon 2002).  As to Adams, the sole responsible adult she
identified to Officer Gallegos was "uncle Andy," who, rather than
accepting Adams, engaged Gallegos to confirm that Barnum was not home.   More importantly, unknown to Gallegos, no
runaway report was possible as to Adams because her guardian Barnum was
murdered.  Once more, Adams has not shown
a causal connection between the complained of unnecessary delay and evidence
she sought to suppress.  Pham,
2005 Tex. Crim. App. LEXIS 832, at*17.  

6. 
Disposition








After reviewing the evidence in the light most
favorable to the trial court's ruling and with appropriate deference, we
conclude that the trial court's ruling on the motion to suppress is reasonably
supported by the record and is correct on the alternate theories articulated
above.  Kombudo, 2005 Tex. Crim.
App. LEXIS 1345, at*3‑4; Villarreal, 935 S.W.2d at 138; Perales,
117 S.W.3d at 438.  We overrule
Adams' sixth issue.

V.  LEGAL
SUFFICIENCY

By her fifth issue, Adams challenges the legal
sufficiency of the evidence to prove that she encouraged, directed, aided, or
attempted to aid in the commission of the murder.  The State responds that a rational trier of
fact could have found the essential elements of the offense beyond a reasonable
doubt.

A. Standard of Review








A legal-sufficiency challenge calls on us to review
the relevant evidence in the light most favorable to the verdict, and then
determine whether a rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt.  Escamilla, 143 S.W.3d at 817 (citing Jackson
v. Virginia, 443  U.S. 307, 319 (1979)); see also
Swearingen v. State, 101 S.W.3d 89, 95 (Tex. Crim. App. 2003) (en banc); Johnson
v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000) (en
banc).  This standard is meant to give
"full play to the [jury's] responsibility fairly" to "draw
reasonable inferences from basic facts to ultimate facts."  Sanders v. State, 119 S.W.3d 818, 820
(Tex. Crim. App. 2003).  We consider all
the evidence that sustains the conviction, whether properly or improperly
admitted. Conner v. State, 67 S.W.3d 192, 197
(Tex. Crim. App. 2001) (citing Garcia v. State, 919 S.W.2d 370, 378
(Tex. Crim. App. 1994) (en banc)). 
Similarly, we consider all the evidence that sustains the conviction,
whether submitted by the prosecution or the defense, in determining the legal
sufficiency of the evidence.  King v.
State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (en banc); Cook v.
State, 858 S.W.2d 467, 470 (Tex. Crim. App. 1993) (en banc).  In this review, we are not to reevaluate the
weight and credibility of the evidence, but rather, we act only to ensure that
the jury reached a rational decision.  Muniz
v. State, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993) (en banc). 

B.  The Law
Applicable to Legal Sufficiency Challenge

1. Hypothetically Correct Jury Charge








The legal sufficiency of the evidence is measured
against the elements of the offense as defined by a hypothetically correct jury
charge for the case.  Malik v. State,
953 S.W.2d 234, 240 (Tex. Crim. App. 1997).  A hypothetically correct charge is one that
(1) accurately sets out the law, (2) is authorized by the indictment, (3) does
not unnecessarily increase the State's burden of proof or restrict its theories
of liability, and (4) adequately describes the particular offense proof.  Malik, 953 S.W.2d at 240;  Cano v. State, 3 S.W.3d 99, 105 (Tex. App.BCorpus Christi 1999, pet. ref'd).  This standard of legal sufficiency ensures
that a judgment of acquittal is reserved for those situations in which there is
an actual failure in the State's proof of the crime, rather than a mere error
in the jury charge submitted.  Malik, at
240.  We then determine if any rational
trier of fact could have found the essential elements of the crime beyond a
reasonable doubt.  Jackson,
443 U.S. at 319; Johnson, 23 S.W.3d at 7.  

With sufficient evidence of Adams' participation in
the planning and commission of Barnum's murder, the indictment supported a jury
instruction on the law of parties without a specific parties allegation in the
indictment.  See Goff v. State,
931 S.W.2d 537, 544 n.5 (Tex. Crim. App. 1996). 
A person is criminally responsible as a party to an offense if the
offense is committed by his own conduct, by the conduct of another for which he
is criminally responsible, or by both.  Tex. Pen. Code Ann. ' 7.01 (Vernon 2003). 
A person is criminally responsible for an offense committed by another,
if, with intent to promote or assist the commission of the offense, he
solicits, encourages, directs, aids, or attempts to aid the other person to
commit the offense. Id. ' 7.02(a)(2) (Vernon 2003).  In determining whether an accused
participated as a party in an offense, a fact finder may examine the events
occurring before, during, and after the commission of the offense and rely on
actions of the accused that show an understanding and common design to commit
the offense.  Hanson v. State, 55
S.W.3d 681, 690 (Tex. App.BAustin 2001, pet. ref'd).  Mere presence is not enough, but presence is
a circumstance tending to prove guilt, which, combined with other facts, may
suffice to show the accused was a participant. 
Edwards v. State, 106 S.W.3d 833, 842 (Tex. App.BDallas 2003, pet. ref'd) (citing Beardsley v.
State, 738 S.W.2d 681, 685 (Tex. Crim. App. 1987)).  Thus, conviction was authorized under the
evidence in this case if a rational jury could find that Adams intentionally
caused Barnum's death, either as a principal or as a party.  See
Tex. Penal Code Ann. ' 19.02(b)(1) (Vernon 2003); see also Hanson,
55 S.W.3d at 690.       








2.  The
Elements of MurderBPenal Code Section 19.02(b)(1)

Murder is a "result of conduct"
offense.  Cook v. State, 884
S.W.2d 485, 490 (Tex. Crim. App. 1994).  
We must decide whether a rational trier of fact could have found beyond
a reasonable doubt that Adams intentionally or knowingly caused the death of
Barnum, Tex. Pen. Code Ann. ' 19.02(b)(1) (Vernon 2003), either as a principal or
a party.  A person acts intentionally,
with respect to the nature of her conduct or as a result of her conduct, when
it is her conscious objective or desire to engage in the conduct or cause the
result.  Tex. Pen. Code Ann _ 6.03(a) (Vernon 2004).  A person acts knowingly , or with knowledge,
with respect to a result of her conduct when she is aware that her conduct is
reasonably certain to cause the result.  Id. ' 6.03(b). 
Adams' intent must be established by circumstantial evidence.  See Dillon v. State, 574 S.W.2d
92, 94 (Tex. Crim. App. 1978).  The jury
may infer the requisite intent from Adams' conduct.  See Conner, 67 S.W.3d at 197.
Motive is a significant circumstance indicating guilt.  Guevara v. State, 152 S.W.3d 45, 50
(Tex. Crim. App. 2004).  Intent may also
be inferred from circumstantial evidence such as acts, words, and the conduct
of the appellant.  Id.

3.  Inferences
of Guilt








In addition to the court's charge, we note that
mental states may be inferred and proven from acts done, words spoken, and the
surrounding circumstances.  See Ledesma
v. State, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984) (en banc).  Intent, in particular, is often shown by acts
done, words spoken, and conduct of the accused at the time of the offense.  Beltran v. State, 593 S.W.2d 688
(Tex.Cr.App.1980); see Conner v. State, 67 S.W.3d 192, 197 (Tex.
Crim. App. 2001).  Evidence of flight is
admissible as a circumstance from which a jury may draw an inference of guilt.  Bigby v. State, 892 S.W.2d 864, 883 (Tex.
Crim. App. 1994) (en banc).  Proof of
intent generally relies on circumstantial evidence.  Dillon v. State, 574 S.W.2d 92, 94
(Tex. Crim. App. 1978).

4. 
Corroboration of Accomplice Testimony

Adams was charged under the law of parties.
Accordingly, the jury could convict her if it found that she was "present
at the commission of the offense and encouraged its commission by words or
other agreement." King v. State, 29 S.W.3d 556, 564 (Tex. Crim.
App. 2000) (en banc); Ransom v. State, 920 S.W.2d 288, 302 (Tex. Crim.
App. 1996) (en banc).








An accomplice is a person who participates in an
offense before, during, or after its commission to the extent that the person
can be charged with the offense or with a lesser offense.  Herron v. State, 86 S.W.3d 621, 631
(Tex. Crim. App. 2002)  (citing Blake
v. State, 971 S.W.2d 451, 454‑55 (Tex. Crim. App. 1998)).  A prosecution witness indicted for the same
offense as the accused is an accomplice as a matter of law.  Id. 
(citing Ex parte Zepeda, 819 S.W.2d 874, 876 (Tex. Crim. App.
1991)). As an accomplice, Macias' testimony must be "corroborated by other
evidence tending to connect the defendant with the offense committed; and the
corroboration is not sufficient if it merely shows the commission of the
offense." Tex. Code Crim. Proc. Ann.
art. 38.14 (Vernon 2004).  We look for
corroboration in all non‑accomplice evidence, both prosecution and
defense. Cook, 858 S.W.2d at 470. 
The required corroborative evidence may be either circumstantial or
direct and need not directly link the accused to the crime.  Richardson v. State, 879 S.W.2d 874,
880 (Tex. Crim. App. 1993); Reed v. State, 744 S.W.2d 112, 126 (Tex.
Crim. App. 1988).  Further, the
corroborating evidence need not establish guilt beyond a reasonable doubt.  Id.

Finally, "proof that the accused was at or near
the scene of the crime at or about  the
time of its commission, when coupled with other suspicious circumstances, may
tend to connect the accused to the crime so as to furnish sufficient
corroboration to support a conviction." Brown v. State, 672 S.W.2d
487, 488 (Tex. Crim. App. 1984). Apparently insignificant incriminating
circumstances may sometimes afford satisfactory evidence of corroboration.  Munoz v. State, 853 S.W.2d 558, 559
(Tex. Crim. App. 1993).  Evidence that an
accused was in the company of the accomplice at or near the time or place of a
crime is proper corroborating evidence to support a conviction.  Hernandez v. State, 939 S.W.2d 173, 178
(Tex. Crim. App. 1997).

C.  The Record

1. 
Non-Accomplice Testimony













Adams' written statement, in which she relates the
events leading to Barnum's murder, was admitted in evidence.  When viewed in the light most favorable to
the verdict, her statement demonstrates that, on March 5, 2003, Macias, Lozano,
and Adams were detained for criminal trespass. 
The three were released but planned to run away to Louisiana that
night.  The plan was to meet at a vacant
house near the apartment Adams shared with Barnum.  At approximately 7:00 p.m., Adams was
released to Barnum.  At home, Barnum and
Adams argued.  Barnum ultimately fell
asleep.  Adams seized the opportunity to
go to the vacant house.  En route, she
met Macias and Lozano.  Macias inquired
whether they could use Barnum's car to pick up his girlfriend, J.R.  Meanwhile, back at the apartment, Barnum was
awake.  While Barnum was engaged in a
telephone conversation, Adams retrieved the car keys from Barnum's purse
without Barnum's knowledge or permission. 
After watching a television show, 
Adams moved to her bedroom.  While
outside Adams' bedroom window, Macias requested Adams hurry so they could
leave.  Adams wanted to wait until Barnum
fell asleep.  Macias responded,
"Just kill her,"  and that
"he would do it."  Adams said,
"No," and again asked that he "wait a while."  When Barnum entered Adams' bedroom, Adams
closed the blinds and explained she was looking out the window.  In a second visit to Adams' bedroom, Barnum
asked for the car keys.  Adams told her
she did not have them and offered to check the car to see if the keys were
there.  Adams "went out and
pretended to go look for the [keys] in the car."  Lozano approached her and told her that
Macias was planning to kill Barnum.  She
asked Lozano if Macias "was serious." 
Lozano responded he thought so but that Macias "did not have the
guts to do it.  That none of [us] had the
guts."  Meanwhile, Barnum exited the
apartment, approaching Adams, but did not see Macias or Lozano.  Adams pretended to look for the keys.  The two returned to the apartment.  Entering first, Adams walked past the
bathroom toward Barnum's room and "saw [Macias] standing there."  She signaled that he not do anything.  Macias looked at her and "shook his
head."  When Barnum passed the
bathroom, Macias "jumped out with a red, white and blue ribbon that was in
the bathroom and started to "struggle" with Barnum.  Adams ran out of the apartment and told
Lozano.  Lozano entered and told Macias
to stop but he did not stop.  Adams
returned to gather her things.  She sat
down and Macias apologized.  Adams told
him to resuscitate Barnum.  Macias
responded that it was too late.  Adams
told Lozano to get Barnum's purse. 
Lozano complied and, on returning, told her that Barnum was "still
breathing."  Adams responded that
they "leave because it was [too] hard for [her] to be there."  They drove to J.R.'s residence but she was
not there.  They drove to a convenience
store, where they bought a map. 
"The police arrived and pick[ed them] up."  

Macias' girlfriend, J.R., testified that Adams
previously planned to kill Barnum by poisoning her.   J.R. testified that Adams previously said
she wanted Barnum to die and made the statement in the presence of Macias and
Lozano.  Barnum's neighbor and the
apartment manager both testified about the acrimony between Barnum and
Adams.  Officer Gallegos testified that
he found Barnum's body after Adams disclosed to Narvaez that an intruder had
attacked Barnum.     

2.  Accomplice
Testimony and Evidence








Both Macias' and Lozano's written statements were
admitted in evidence.  Macias testified
at trial.  In the light most favorable to
the verdict, the evidence shows that, when Macias spoke with Adams at her
bedroom window, Adams said "it was better if we killed her.  She told me how she wanted to kill her
grandmother. . . that when her grandmother was [asleep], for [Lozano] to hold
her by the legs while she [held] her arms down. 
She then told me that for me to suffocate her with something."  Outside the apartment, Adams told Macias and
Lozano that "we were going to kill her grandmother."  They decided they would carry out Adams'
plan.  Adams entered the apartment and
returned with a red, white, and blue ribbon to use to choke Barnum.  Macias removed the medal from the ribbon and
threw it on the lawn.  Macias identified
the medal investigators located at the crime scene as the medal he removed from
the ribbon.  While Adams was outside the
apartment, Macias entered the apartment and hid in the bathroom.  He heard Adams enter the apartment and heard
Barnum ask her for the car keys.  Adams
walked past the restroom and told Barnum to check her room for the keys.  As Barnum walked by, Adams choked her with
the ribbon.  Adams began to cry and ran
to the living room.  Lozano entered and
briefly observed before walking toward Adams. 
At one point, Macias stopped the attack but continued after Adams
threatened to call the police and report that Macias attacked her, too.  After Barnum was motionless, Macias
approached Adams and apologized.  Adams
told Lozano to retrieve Barnum's purse. 
Lozano complied.  The three left
in Barnum's car, with Adams driving. 

D. 
Disposition

The State presented evidence on both principal and
party theories.  The jury charge
contained an instruction on both theories. 
Thus, the charge authorized the jury to find Adams guilty if she acted
either as a party or as a principal to the offense.  The jury rendered a general verdict of
guilty.  Thus, if evidence of guilt is
sufficient, we will affirm the verdict based on either theory.  See Rabbani v. State, 847 S.W.2d 555,
558 (Tex. Crim. App. 1992) (en banc); Edwards, 106 S.W.3d at 842; see
also Kitchens v. State, 823 S.W.2d 256, 259 (Tex. Crim. App. 1991).








The jury was authorized to convict Adams as a party
to murder if the evidence showed that, if, with intent to promote or assist the
commission of the offense, she solicited, encouraged, directed, aided, or
attempted to aid the other person to commit the offense.  Tex.
Pen. Code Ann. ' 7.02(a)(2) (Vernon 2005).  In our sufficiency review, we are governed by
the fact that the jury is the exclusive judge of the facts proved, the
credibility of the witnesses, and the weight to be given to the testimony.
Earls v. State, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986); Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 2004).  The jury may believe or disbelieve all or any
part of a witness's testimony, even though the witness's testimony has been
contradicted.  Sharp v. State, 707
S.W.2d 611, 614 (Tex. Crim. App. 1986).  Reconciliation
of conflicts in the evidence is within the exclusive providence of the
jury.  Jones v. State, 944 S.W.2d
642, 647 (Tex. Crim. App. 1996). 
Evidence is not rendered insufficient when conflicting evidence is
introduced.  Matchett v. State,
941 S.W.2d 922, 936 (Tex. Crim. App. 1996). 
If the evidence is sufficient to establish a defendant as either a
principal or as a party, we must affirm the jury's verdict.  Edwards, 106 S.W.3d at 842.

In this case, the jury was free to place whatever
value it wished on Adams' statement.  See Wesbrook v. State, 29 S.W.3d
103, 112 (Tex. 2000) (en banc).  The
State presented testimony throughout the trial of witnesses who recalled the
key events that occurred on March 5, 2003. 
Thus, the jury was free to disbelieve Adams' written statement, to
reconcile any discrepancies in the testimony before it, and to judge the
credibility of the witnesses including Macias. See id. at 111. 








Viewed in the light most favorable to the verdict,
the evidence establishes that, on March 5, 2003, Adams was an eye witness to
the murder of Barnum.  Whether or not the
plan to kill Barnum was Adams', she knew before the attack that Barnum was in
danger.  She provided the weapon or at
least access to the weapon.  She wanted
Barnum dead before and on the date of the murder.  While in possession of the car keys Barnum
sought, Adams lured her through the hall adjoining the bathroom, where she knew
the assailant waited, by suggesting Barnum look for the keys in the bedroom.  She did not warn Barnum that the assailant
was in the bathroom and that her life was in danger.  When the attack ensued, Adams did nothing to
prevent or stop it.  Adams remained at
the crime scene until Barnum was motionless. 
When told that Barnum was still breathing after the attack, Adams'
response was to request Barnum's purse and voluntarily flee with the
assailant.  Next, Adams perpetuated a
plan to conceal the crime by not disclosing to Officer Gallegos its occurrence
or the assailant, although she had ample opportunity to do so.  She concealed the identity of the assailant
by misrepresenting that an intruder had attacked Barnum.  Adams did not request assistance for Barnum
until after the body was discovered.  

Adams argues that the evidence fails to show that
she encouraged, directed, aided or attempted to aid in the commission of the
murder, which she maintains are all required elements of the offense as an
accomplice.  However, because Adams was
charged under the law of parties,  the
jury could convict her if it found that she was "present at the commission
of the offense and encouraged its commission by words or other
agreement."  King, 29 S.W.3d
at 564; Ransom, 920 S.W.2d at 302.








The record shows evidence of prior confrontations
between Barnum and Adams as well as evidence of Adams' malcontent towards
Barnum.  Although Adams denied she
strangled Barnum, evidence was produced to show that she was present at the
time of the strangulation and did nothing to prevent or report it. Testimony
demonstrates that Adams wanted Barnum dead and had on prior occasions put
poison in Barnum's beverage and spoke of ways to kill her.  By its verdict, the jury could have concluded
beyond a reasonable doubt that Adams' death wish for Barnum materialized.  Thus, the jury could have reasonably
convicted Adams on the theory that she acted as a party by directing Macias to
kill Barnum and aiding the murder by affording access to her.  Tex.
Pen. Code Ann. ' 7.02(a)(2) (Vernon 2003).  Further, the jury could reasonably infer
Adams' guilt from the evidence that she fled the scene.  See Bigby, 892 S.W.2d at
883.  








Considering only the evidence in favor of the
verdict, measured against a hypothetically correct jury charge on murder and
the law of parties, we conclude: 
(1)  the non-accomplice evidence
furnished sufficient corroboration to sustain the conviction; (2) the evidence
is legally sufficient to prove the essential elements of the offense of murder
and to sustain the conviction on a party theory; and (3) any rational trier of
fact could have found the essential elements of the crime beyond a reasonable
doubt.  See Jackson, 443
U.S. at 319; see also Johnson, 23 S.W.3d at 7; Sanders,
119 S.W.3d at 820.  We affirm the jury's
verdict on the theory that Adams participated as a party to murder.  See Tex.
Pen. Code Ann. ' 7.02(a)(2) (Vernon 2003); see also
Rabbani, 847 S.W.2d at 558; Kitchens, 823 S.W.2d at 259; Edwards,
106 S.W.3d at 839.  We overrule Adams'
fifth issue.  

VI. 
CONCLUSION

Having overruled all of Adams'  issues, we affirm the judgment of the trial
court.

 

ERRLINDA CASTILLO

Justice

 

Publish

Tex. R. App.
P.47.2(b)

 

Opinion
delivered and filed

this
8th day of December, 2005.

 











[1] The indictment alleged that on or
about March 5, 2003, Adams caused the death of Jan Barnum by strangling her
with a ribbon. A person commits murder if she causes the death of an
individual.  See Tex. Pen. Code Ann. ' 19.02 (Vernon 2003).  The juvenile court waived and then
transferred jurisdiction to the district court.





[2] Adams raises six issues on
appeal.  In her first issue, Adams
asserts that the trial court lacked jurisdiction to prosecute Adams, a
juvenile, because the juvenile court did not comply with section 53.06(a) of
the family code.  In her second issue,
Adams maintains that the juvenile court failed to admonish her pursuant to
title 3 of the family code generally, thereby invalidating transfer to the
criminal district court.  Adams asserts
this violation of her due process and due course of law rights mandates reversal.  Adams also claims that the trial court abused
its discretion in denying her motion for severance (third issue) and the
resulting reduction of her peremptory challenges from ten to six because
multiple defendants were tried together (fourth issue) resulted in
prejudice.  Adams asserts in her fifth
issue that the evidence was legally insufficient to support a conviction for
murder because the State failed to show that Adams encouraged, directed, aided,
or attempted to aid in the commission of the murder.  In her sixth and final issue on appeal, Adams
asserts that the trial court erred in denying her motion to suppress evidence.





[3] The State called numerous
witnesses to testify about the crime scene, forensics, and juvenile proceedings
leading up to the transfer proceedings, as well as the three co-defendants'
oral and written statements.   





[4] Barnum and Adams moved into
Barnum's apartment in January 2003; Adams having previously resided with her
great-grandmother.  





[5] Officer Vargas was off duty, in a
civilian automobile and at the drive-through window of the store when Aguilar
told him about the juveniles.  Aguilar's
concern was that the time was after curfew, 
the juveniles were underage, and "nervous."  Meanwhile, Barnum's car stalled at the
convenience store.





[6] Narvaez is not Adams' uncle.  





[7] Forensic testing showed that the
hairs could not be excluded as Adams' head hair.





[8] When an individual is taken into
custody and subjected to questioning, the U.S. Constitution amendment V
privilege against self-incrimination is jeopardized.  To protect the privilege, procedural
safeguards are required called "Miranda warnings."  Miranda v. Arizona, 382 U.S. 436
(1966).

 





[9] Evidence showed that Barnum
disapproved of the presence of Macias and Lozano in the apartment, requesting
that they leave.  When Adams insisted
that they stay, Barnum left to her room. 






[10] Section 53.06 states:

 

  
(a) The juvenile court shall direct issuance of a summons to:

 

  
(1) the child named in the petition;

  
(2) the child's parent, guardian, or custodian;

  
(3) the child's guardian ad litem; and

  
(4) any other person who appears to the court to be a proper or

  
necessary party to the proceeding.

 

  
(b) The summons must require the persons served to appear before the
court at the time set to answer the allegations of the petition. A copy of the
petition must accompany the summons.

 

  
(c) The court may endorse on the summons an order directing the person
having the physical custody or control of the child to bring the child to the
hearing.  A person who violates an order
entered under this subsection may be proceeded against under Section 53.08 or 54.07
of this code.

 

  
(d) If it appears from an affidavit filed or from sworn testimony before
the court that immediate detention of the child is warranted under Section
53.02(b) of this code, the court may endorse on the summons an order that a law‑enforcement
officer shall serve the summons and shall immediately take the child into
custody and bring him before the court.

 

  
(e) A party, other than the child, may waive service of summons by
written stipulation or by voluntary appearance at the hearing.

 

Tex. Fam.
Code Ann. ' 53.06 (Vernon 2002).





[11] Section 54.03 states in pertinent
part:

 

(b) At the beginning of the
adjudication hearing, the juvenile court judge shall explain to the child and
his parent, guardian, or guardian ad litem:

(1) the allegations made against
the child;

(2) the nature and possible
consequences of the proceedings, including the law relating to the
admissibility of the record of a juvenile court adjudication in a criminal
proceeding;

(3) the child's privilege against
self-incrimination;

(4) the child's right to trial and
to confrontation of witnesses;

(5) the child's right to
representation by an attorney if he is not already represented; and

(6) the child's right to trial by
jury.

 

Tex. Fam.
Code Ann. _54.03(b) (Vernon Supp. 2004-05).





[12] Section 54.02(a)(2)(B) of the
family code provides that the juvenile court may transfer a child over the age
of fifteen to district court, for prosecution, if (1) the child is alleged to
have violated a penal law of the grade of felony, (2) so long as no
adjudication hearing has been conducted concerning that offense, and (3) the
requirements of sections 53.04 through section 53.07 are met.  Tex.
Fam. Code Ann. _' 53.04‑07, 54.02 (Vernon
2002).





[13] The juvenile court cannot acquire
jurisdiction over the juvenile in the absence of personal service of the
summons on the child.  Johnson v. State,
551 S.W.2d 379, 381 (Tex. Crim. App. 1977).





[14] The summons identifies the persons
served.  The precept to serve identifies
the persons to be served and shows notice to appear before the juvenile court,
at the date and time set, to answer the allegations of the petition. The
precept to serve states that the Petition for Discretionary Transfer to
Criminal Court "is attached hereto and made a part of" same.  The executed return shows that Adams was
personally served with summons on May 20, 2003, at 8:26 a.m.   Proof of service is also shown as to her
guardian ad litem and great-grandparents. 






[15] As the State notes, the summons
was in the trial court record in juvenile court cause number J-191-03-A,
In re Megan Mae Adams, A Child.  





[16] See note 11. 





[17] Section 54.03(i) specifically
requires an objection to the lack of judicial admonition in order to preserve
the issue for appellate or collateral review. 
Tex. Fam. Code Ann. ' 54.03 (Vernon Supp.  2004-05); In re C.O.S., 988 S.W.2d 760, 763
(Tex. 1999).





[18] We must address even an
alternative argument in an appellee's reply. 
Kombudo v. State, No.1832-04, 2005 Tex. Crim. App. LEXIS 1345,
(Tex. Crim. App. September 14, 2005) (per curiam).





[19] The Legislature provided different
rules for different stages of a juvenile proceeding.  In re J.P., 136 S.W.3d 629, 630 (Tex.
2004); see Tex. Fam. Code Ann.
'54.03(a) (Vernon Supp. 2004‑05).
Section 54.03(a) of the family code states that a "child may be found to
have engaged in delinquent conduct or conduct indicating need for supervision
only after an adjudication hearing conducted in accordance with the provisions
of this section."  Id. at ' 54.03(a) (Vernon Supp.
2004-05).  





[20] Preservation of error for
appellate review under Texas Rule of Appellate Procedure 33 requires that the
record demonstrate (1) the complaining party made a timely and specific
request, objection, or motion; and (2) the trial judge either ruled on the
request, objection, or motion, or he refused to rule and the complaining party
objected to that refusal. Haley v. State, No. 1531-03, 2005 Tex. Crim.
App. LEXIS 1621, at *11 (Tex. Crim. App. October 5, 2005) (citations
omitted).  An objection must be timely,
specific, pursued to an adverse ruling, and must be made each time inadmissible
evidence is offered.  Id.  Two exceptions apply to the requirement of
subsequent objections:  counsel may
obtain a running objection or request a hearing outside the presence of the
jury.  Id.





[21] Article 36.09 states:

 

Two or more defendants who are
jointly or separately indicted or complained against for the same offense or
any offense growing out of the same transaction may be, in the discretion of
the court, tried jointly or separately as to one or more defendants; provided
that in any event either defendant may testify for the other or on behalf of
the state; and provided further, that in cases in which, upon timely motion to
sever, and evidence introduced thereon, it is made known to the court that
there is a previous admissible conviction against one defendant or that a joint
trial would be prejudicial to any defendant, the court shall order a severance
as to the defendant whose joint trial would prejudice the other defendant or
defendants. 

 

TEX. CODE
CRIM. PROC. ANN. art.
36.09 (Vernon 1981).





[22] Adams' counsel argued, "I
echo some of [counsel's] concerns.  But
again, at this point it is based more on speculation than actual facts because
I don't know what the other two Defendants intend to do during the course of
trial.  So, to that extent we would
oppose the severance."  Lozano's
counsel reserved the right to file a motion for severance should evidence arise
to support it.  





[23] Adams also does not assert that
the extrajudicial statements were noncompliant with Texas Family Code section
51.095(a), providing that "the statement of a child is admissible in
evidence in any future proceeding concerning the matter about which the
statement was given if" certain procedural requirements are followed.  See Tex.
Fam. Code Ann. ' 51.095(a) (Vernon 2002).  





[24] The statements were admitted in
the transfer proceeding. 





[25] The jury heard that the apartment
showed no visible signs of forced entry. 
The jury also heard from a neighbor that Barnum and Adams were outside
the apartment, later determined by law enforcement to be not long before the
murder.  Further, consistent in the three
extrajudicial statements is the fact that Adams knew Macias and Lozano were
outside the apartment waiting for Adams.





[26] Although Adams argued that there
were varying degrees of guilt between all the defendants, proof that the
defendants have different levels of culpability is not enough to establish that
separate trials are required.  Morales
v. State, 466 S.W.2d 293, 296 (Tex. Crim. App. 1970); Davila v. State,
4 S.W.3d 844, 847 (Tex. App.CEastland 1999, no pet.). 





[27] Section 52.02(a) of the Texas
Family Code provides the following options to a person taking a child into
custody:

 

(1) release the child to a parent,
guardian, custodian of the child, or other responsible adult upon that person's
promise to bring the child before the juvenile court as requested by the court;

 

(2) bring the child before the
office or official designated by the juvenile court if there is probable cause
to believe that the child engaged in delinquent conduct or conduct indicating a
need for supervision;

 

(3) bring the child to a detention
facility designated by the juvenile court;

 

(4) bring the child to a secure
detention facility as provided by Section 51.12(j);

 

(5) bring the child to a medical
facility if the child is believed to suffer from a serious physical condition
or illness that requires prompt treatment; or

 

(6) dispose of the case under
Section 52.03.

 

Tex. Fam.
Code Ann. _52.02(a) (Vernon Supp. 2004-05).  Because Adams was a juvenile at the time of
her arrest, the provisions of the family code control issues involving the
appellant's  substantive rights.  Roquemore v. State, 60 S.W.3d 862, 866
(Tex. Crim. App. 2001) (citing Comer v. State, 776 S.W.2d 191, 196 (Tex.
Crim. App. 1989)(holding that issues involving the substantive rights of pre‑transfer
juveniles are governed by the family code)). Section 52.02(a) of the family
code reads in relevant part: "A person taking a child into custody,
without unnecessary delay and without first taking the child to any place other
than a juvenile processing office designated under section 52.025 of this code,
shall do one of the following [enumerated acts]." Tex. Fam. Code Ann. ' 52.02(a) (Vernon Supp. 2004‑05).  This section does "not preclude the
admission of a statement made by the child if: . . . the statement does not
stem from custodial interrogation."  Tex. Fam. Code Ann. ' 51.095(b)(1) (Vernon 2002).





[28] Adams directs us to sections 52.04
(governing referral to juvenile court), 53.01 (governing preliminary juvenile
investigation and determinations), 53.02 (governing release from detention),
and 54.01 (governing juvenile detention hearings) of the family code.  Tex.
Fam. Code Ann. __52.04, 53.01, and 54.01 (Vernon
Supp. 2004-05); id. _53.02 (Vernon 2002).





[29] When a trial court overrules a
suppression motion before trial, the accused need not object during trial to
the same evidence to preserve error on appeal. 
Wilson v. State, 857 S.W.2d 90, 93 (Tex. App.BCorpus Christi 1993, pet. denied)
(citing Moraguez v. State, 701 S.W.2d 902, 904 (Tex. Crim. App.
1986)).  However, the accused waives any
error caused by admission of the evidence, despite the pretrial ruling, by
affirmatively asserting during trial "no objection" to admission of
the evidence.  Moraguez, 701
S.W.2d at 904.  





[30] Evidence at trial showed that,
prior to leaving the apartment, Adams told Lozano to go to Barnum's bedroom and
retrieve Barnum's purse.  He
complied.  She then asked him to retrieve
her pet hamster from her bedroom.  Again,
Lozano complied.





[31] Defense counsel requested the trial
court to suppress "any evidence that the State is going to be attempting
to introduce at the time of trial, any evidence that was taken from Ms. Adams,
and specifically the statement that was made allegedly by her to Mr. Narvaez
and then to Officer Gallegos."  





[32] A taking of a child into custody
is not an arrest except for purposes of determining the legal validity of the
search and seizure itself.  See Tex. Fam. Code Ann. ' 52.01(b) (Vernon Supp. 2004‑05).  Section 51.095 of the family code governs the
admissibility of a child's statement.  Tex. Fam. Code Ann. ' 51.095 (Vernon 2002).  Section 51.095 does not preclude the
admission of a child's statement if the statement does not stem from
interrogation of the child while in the custody of an officer.  Tex.
Fam. Code Ann. ' 51.095(b), (d) (Vernon 2002).  The family code contemplates that once a law
enforcement officer has found cause initially to take a child into custody and
makes the decision to refer her to the intake officer or other designated
authority, a law enforcement officer relinquishes ultimate control over the investigative
function of the case.  See Tex. Fam. Code Ann. '' 52.02(a) ,52.04(a), and 54.02(d)
(Vernon 2002); Comer v. State, 776 S.W.2d 191, 196 (Tex. Crim. App.
1989).  The Legislature intended that the
officer designated by the juvenile court make the initial decision whether to
subject a child to custodial interrogation. 
Id. 





[33] "Custodial
interrogation" is "questioning initiated by law enforcement officers
after a person has been taken into custody or otherwise deprived of his freedom
of action in any significant way."  
Wilkerson v. State, No.-1605-04, 2005 Tex. Crim. App. LEXIS 1619,
at*8 (Tex. Crim. App. 2005) (citing Miranda, 384 U.S. at 444).





[34]We observe that, after Narvaez told
Officer Gallegos what Adams relayed regarding Barnum, the officer's decision to
detain Adams was based on a superceding reason involving an offense against
Barnum including victimization and absconding with her vehicle.  It seems the clear intent of the statutory
scheme of the family code as a whole is that from this point on, the decision
as to whether further detention is called for is to be made, not by law
enforcement personnel, but by "the intake or other authorized officer of
the court; see Tex. Fam. Code Ann.
' 53.02 (Vernon 2002); see also '' 52.04 & 53.01 (Vernon 2002),
with investigative aid of law enforcement officers when requested, see ' 52.04(b),  or by the juvenile court itself, see Tex. Fam. Code Ann. ' 54.01  (Vernon 2002); Comer, 776 S.W.2d at
194.